(C. D. 1033)

PEAT PRODUCTS CORP. *v.* UNITED STATES

United States Customs Court, Third Division

(Decided November 7, 1946)

*James W. Bevans* for the plaintiff.

*Paul P. Rao,* Assistant Attorney General (*Dorothy C. Bennett* and *Harold L. Grossman,* special attorneys), for the defendant.

Before CLINE, KEEFE, and EKWALL, Judges

EKWALL, Judge: This case involves the dutiable classification and assessment of duty on a quantity of peat moss imported from Canada known as "poultry grade." The importation consisted of two grades, the "horticultural" and "poultry," but only the lump form or poultry grade is here involved. It was assessed at 50 cents per ton under the *eo nomine* provision for peat moss in paragraph 1548 of the Tariff Act of 1930. Plaintiff claims free entry under the provisions of paragraph 1685 for substances used chiefly for fertilizers, or chiefly as an ingredient in the manufacture of fertilizers. Said paragraph 1685 is in the following language:

PAR. 1685. Guano, bosic slag (ground or unground), manures, and (notwithstanding any other provision of this Act) those grades of all other substances used chiefly for fertilizers, or chiefly as an ingredient in the manufacture of fertilizers.

The question of the dutiable classification of poultry peat moss has been before this court in the case of *Half Moon Manufacturing & Trading Co. et al.* v. *United States*, 9 Cust. Ct. 37, C. D. 656. In that case it was agreed by counsel that the commodity was "chiefly used by poultry farmers as bedding on the floors of chicken houses, to keep the floors clean and to absorb the chicken droppings. That afterwards the imported merchandise with the chicken droppings mixed throughout is chiefly used as a fertilizer by the said poultry farmers or is sold by them to other farmers who use it chiefly as a fertilizer." It was the opinion of the court and it so held that in view of the agreement that the poultry peat moss was chiefly used by poultry farmers as bedding on the floors of chicken houses, the claim that it was chiefly used as a fertilizer could not be sustained, inasmuch as there could not be two chief uses. It was further held that the provision in paragraph 1685, *supra*, for "those grades of all other substances used chiefly * * * as an ingredient in the manufacture of fertilizers" could have no application to the merchandise there before the court for the reason that the incorporation of the chicken droppings with the peat did not constitute a manufacture. In arriving at this conclusion, the court cited the cases of *Hartranft* v. *Wiegmann*, 121 U. S. 609, and *Frazee* v. *Moffitt*, 20 Blatch. 267. In the *Hartranft* case, *supra*, the Supreme Court held that the application of labor to an article does not necessarily make it a manufactured article, and that shells from which the outer layer had been removed by acid, and the second layer ground by an emery wheel, were not manufactured. In the *Frazee* v. *Moffitt* case, *supra*, it was held that pressing hay into bales was not a process of manufacture. See also *Tide Water Oil Co.* v. *United States*, 171 U. S. 210, 216, and *Ishimitsu* v. *United States*, 11 Ct. Cust. Appls. 186, T. D. 38963.

The horticultural grade of peat moss included in this shipment is not the subject of controversy. The collector allowed free entry to that commodity following the decision of this court in *Peat Import Corp.* v. *United States*, 4 Cust. Ct. 181, C. D. 319, wherein the court found that it was chiefly used as a fertilizer at or immediately prior to its importation.

Plaintiff contends that as both poultry and horticultural peat moss contain potash, phosphates, and nitrogen, although the percentages of these ingredients vary slightly, and as peat moss is removed from the deposit in blocks, there could be no change in the qualities and constituents merely by varying the degree of fineness into which the blocks are resolved by machinery. Furthermore, he contends that

the fertilizing qualities in the horticultural peat moss before the court in the *Peat Import Corp.* case, *supra*, are present in the instant merchandise. Therefore, he contends, that unless the chief use of the poultry peat here involved has been shown to differ from that of the peat in the *Peat Import Corp.* case, *supra*, the same conclusion should be reached in this case, i. e., that the instant commodity is properly free of duty as a fertilizer.

It is the Government's contention that the fertilizer paragraph, 1685, is not applicable because the chief use of this grade of peat moss at and prior to the date of importation was as a bedding for poultry houses, for the preservation of the health, cleanliness, and comfort of the poultry, and that any other use to which this grade may become susceptible as a result of that chief use is an incidental use which does not even exist until after the peat moss has served its primary purpose as a bedding for poultry. The Government contends further that this secondary use is immaterial for dutiable classification purposes, for the reason that the peat moss, after having served its chief use as poultry bedding, is no longer the article imported, and that the use of peat moss as poultry bedding cannot properly be considered as a manufacturing process.

The record shows that this grade of peat is used in chicken houses as a litter, that it is allowed to remain on the floors of the houses for a considerable period during which it becomes impregnated with chicken droppings, and the resultant product of peat and chicken droppings is used as a fertilizer.

We must therefore determine whether the chief use of this grade of peat is as a fertilizer, or as an ingredient in the manufacture of fertilizers. In the earlier case of *Half Moon Manufacturing & Trading Co. et al.* v. *United States, supra*, we held, as stated above, that poultry grade of peat could not be classified as a substance used chiefly in the manufacture of fertilizers because the incorporation of the chicken droppings with the peat did not result in an article produced by the application of labor by hand or by mechanism, and consequently this resultant product was not a manufacture.

Plaintiff contends that inasmuch as it has been held that the combination of certain chemicals constitutes a manufacturing process and that the resultant product is a manufacture (*Murphy* v. *Arnson*, 96 U. S. 131), therefore it follows that the resultant product of this peat and chicken droppings is a manufacture even though no more labor was necessary to produce the combination than that required to effect the chemical combining of two or more ingredients.

Has plaintiff proven that the chief use of this peat is for fertilizer, or as an ingredient in the manufacture of fertilizer, or is the use by poultrymen as a litter for poultry houses the chief use, and the use as a fertilizer a secondary use?

The case of *Wilbur-Ellis Co. et al.* v. *United States*, 18 C. C. P. A. (Customs) 472, T. D. 44762, laid down the following rule that where a tariff act provides "that the thing designated shall be classified under a given provision only if chiefly used for a specified purpose, the question of use should be determined, not as of the effective date of the tariff act but as of the date of the importation of the particular merchandise involved or immediately prior thereto."

The evidence consists of the testimony of 11 witnesses and 5 exhibits—a sample of the poultry grade of peat moss, a sample of the horticultural grade not in controversy, a laboratory report of the analyses of these two exhibits, a sample of peat moss in its natural condition as it is dug from the bog, and a report relating to the moisture absorbing capacities and fertilizer values of various materials used for bedding in poultry houses.

The president of the importing firm, introduced as a witness on behalf of the plaintiff, testified that he owns the bog in Canada from which the instant merchandise was obtained. He produced a sample (illustrative exhibit A) of peat moss as it is removed from his bog, and testified that it is dug from the bog in large chunks and is then piled in what are called chimneys, criss-crossed, to allow the air to circulate through and dry it. After being dried, it is brought into the factory, put through a cutting machine or a breaker, screened into the fine or the medium grade, and is pressed in bales and shipped. He explained that when this peat is reduced to the fine size it is known as the horticultural grade which is sold in the United States to greenhouses and nurserymen for growing plants. He stated that they made the coarser or poultry grade such as that here involved—

Because we found when they used the poultry house for large chickens that the fine material was too dusty. The flapping of the chickens' wings, and so forth, would make the house very dusty, and the people objected to it, they wanted the coarser stuff. Besides, it didn't break down as quickly.

By "breaking down" he explained he meant pulverize. Upon being interrogated as to the use of this poultry grade after it had been placed in the poultry houses, the witness answered:

In a great many instances it is sold as a fertilizer.

He further testified that at the time of the trial of this case (1944), he did not sell west of the Rocky Mountains, and that his company sold the poultry grade principally to feed dealers, hatcherymen, broiler plants, and to some extent, to poultry farmers.

Plaintiff's witness, Dr. Stokes, had previously been employed by the United States Department of Agriculture in research work on peat moss, having had long experience in the scientific study of peat deposits throughout the United States, Europe, and Canada.

His testimony consisted of discussion, from a scientific viewpoint of the origin, degrees of decomposition, chemical analyses, and uses of all classes of peat moss. When asked as to the effect of peat moss upon the soil, with special regard to the fineness of the particles, he explained that "the finer the material, of course, that much more intimate is the union between the soil and the organic material" and therefore "the action is much more rapid." In this connection he stated that 3 to 4 years would be required before any material change would result to the soil after the application of the coarse or poultry grade, as against 2 years for the finer or horticultural grade.

On the question of chief use of the poultry grade the witness stated:

* * * In my travels over the United States I have visited, of course, a good many of those producers of poultry peat, and I have invariably inquired to what extent that material is used in their local area; and my experience has been that poultry litter is used for poultry purposes, that is, in poultry houses.

By poultry litter he explained that he referred to the poultry grade of peat moss before it has been removed from the chicken houses with the chicken droppings. As to the use of this material after it has absorbed the chicken droppings and been removed from the houses, this witness testified that from the few contacts he had with people who are actually using it in the field, he had seen it piled in heaps to be applied in the fields; that he has seen it used in Ohio, in Quebec, and in fox farming in Alaska. He also knew of its use in foot and mouth diseases or when certain epidemics occurred, and that it is so used because of the particular qualities that it has in holding down bacterial diseases. Although this latter use was given by the witness as the use of the material after having been impregnated with chicken droppings, it is plain that he misunderstood the question, and his answer referred to the peat as imported.

At the later hearing held in Buffalo plaintiff introduced five witnesses whose testimony may be summarized as follows. This coarse or poultry grade of peat moss is used in chicken houses as a litter and is superior to other materials such as straw, shavings, etc., in that it is more absorbent and tends to keep the floors of the houses drier, thus making a more sanitary floor covering, and further that its use makes cleaning of the houses easier. All of the witnesses stated that after having been used in the poultry houses, the peat is used as a fertilizer on the land. However, none of these witnesses stated what the chief use of this peat, in his opinion, is, although one witness stated that he knew of people who particularly bought peat moss with the idea of putting it on the floor of chicken houses first, but eventually on the land, and that he had seen it so used. However, he did not state what proportion this group bore to the other purchasers of poultry peat. Another of the witnesses on behalf

of the plaintiff, a retail feed and fertilizer dealer, testified that persons to whom he sold poultry peat selected it as a litter for chicken houses and also for stables, with the ultimate purpose of using it as a fertilizer upon the soil. This information he had obtained not by having seen such use made of it but by inquiries in the course of his business dealings. It is noted that all this testimony related only to the State of New York, part of Pennsylvania, and parts of West Virginia and Ohio.

Plaintiff in his brief contends that the evidence establishes conclusively that the purpose of selecting peat moss as a litter is that it collects and retains the valuable constituents of chicken droppings to a greater extent than any other form of litter and therefore makes a better fertilizer for the soil. The conclusion he draws from the testimony is that the chief use of this peat is not for the purpose of keeping the floors of poultry houses clean but for producing a fertilizer of high efficiency to be applied to the soil, and consequently that its chief use is for fertilizing purposes, to improve the soil.

The defendant introduced three witnesses. The first of these is the head of the poultry department of the State Institute of Agriculture at Farmingdale, New York, which position he has held since 1927. His duties consist of teaching poultry raising and supervising the New York State egg-laying contest.

His earlier experience consisted of alternate periods of attendance at agricultural colleges in which he specialized in commercial poultry housing, judging and marketing poultry, studying the diseases of poultry, and working as a poultryman on large farms to gain practical experience. He also taught poultry raising and had supervision over the poultry plant at the Vermont State School of Agriculture. His testimony was that all of these places maintained poultry houses. During his experience at Farmingdale, he has used various kinds of litter in the poultry houses, including rice straw, wheat straw, oat straw shavings, oat hulls, peanut hulls, peanut shells, and peat moss; he has used as much as 150 bales of peat moss, weighing 100 pounds each, per year. It has been his experience that the poultry grade is preferable for the reason that the finer grade is very dusty and causes an irritation in chickens similar to bronchitis. He stated his reason for placing peat moss on poultry house floors to be that some form of bedding material is necessary for sanitary reasons, and in addition, where the roosts are 30 inches above the floor, the birds jump to the floor from the roosts and if the floor is not well covered foot bruises result causing infection. Peat moss, he testified, is used also because it absorbs a large quantity of moisture and also saves labor, which is the second highest cost in poultry production. This witness also testified that by the use of peat the houses need not be cleaned so often, the peat acting as a drying agent. In using other litter mate-

rials, the chicken droppings go through to the floor of the houses where they are walked on by attendants and become plastered to the floor binding with the cement, making it extremely difficult to get the refuse off the floors at cleaning time. He stated that he never had purchased any peat moss for the sole purpose of making fertilizer.

On cross-examination he stated that as a practical poultryman he considered that the capacity of this peat moss to absorb the fertilizing elements in the chicken droppings "is subsidiary to the main point that it absorbs moisture in the poultry houses." He also stated that after removal of the peat from the poultry houses it is thrown on the farm; but they do not manufacture fertilizer as a business at his school.

The defendant also produced the testimony of two practical poultry farmers. The first of these, a baby chick hatcher for 15 years, with poultry houses having a capacity of 1,500 layers and 2,000 or 3,000 young birds, stated that for the past 6 or 8 years he has used peat in lump form like exhibit 1 as litter for the baby chicks; that he likes the lump grade because the finer grade is too dusty. This witness gave as the reason for using peat moss on the floors of the houses as "mainly to preserve the health of the chicks" because it "absorbs moisture which in turn prevents disease." He buys his peat from a feed dealer, as peat moss, and in using it for litter he generally mixes it with wood shavings for economy's sake; and he generally leaves this litter on the floors for a period of 10 weeks after which he removes it and spreads it on his land in conjunction with a commercial fertilizer. By commercial fertilizer he explained that he meant a complete plant food.

The defendant's last witness has been a poultry producer since 1923; for the last 8 or 9 years he has had poultry houses accommodating 5,000 chickens of all sizes. He uses the poultry grade peat for litter; in fact, for the last 15 years has used nothing but peat for that purpose. He testified that he applies this peat to the floors to build up the litter and also to preserve the health of the chickens because diseases cannot live in poultry manure that is kept dry. After using numerous other kinds of litter, he found peat the best because with it he can have a "build-up litter," and also because the droppings dry rapidly with peat moss if given the right ventilation and heat; that it holds the ammonia content in dry form and is also labor saving, that being "one of the other main reasons" he prefers peat. On cross-examination he stated that when he removes the litter he tries to sell it and occasionally does, but if he cannot sell it he gives it away as he does not farm.

We are unable to find from the testimony that the plaintiff has sustained his burden of proving that the class or grade of peat moss known as poultry grade was chiefly used throughout the United States at and immediately prior to the time of exportation of this shipment

either for fertilizer or as an ingredient in the manufacture of fertilizers. One of the plaintiff's own witnesses, the president of the importing firm who owns the peat bog in Canada from which this importation was obtained, testified that this particular grade is expressly produced for use as a bedding in poultry houses. We find that the evidence falls far short of showing that the poultry grade is placed in poultry houses chiefly for the purpose of creating a fertilizer material to be subsequently used for the improvement of the soil. On the contrary, the evidence discloses that this grade of peat, at the time of importation, was chiefly used as a bedding or litter in poultry houses to maintain the health and comfort of the poultry and as an aid to the commercial poultryman in maintaining sanitary conditions in the poultry houses with a minimum expenditure of labor. It was agreed by the witnesses that the use of a bedding for poultry houses is essential to the profitable raising of poultry commercially. In view of the wording of the statute making chief use the criterion, it is immaterial whether this grade of peat is used as a fertilizer in the condition it may acquire subsequent to importation as a result of having been put to its chief use.

In regard to plaintiff's alternative claim that this poultry grade is used chiefly "as an ingredient in the manufacture of fertilizers," we are of the opinion that the conclusion arrived at in the *Half Moon Manufacturing & Trading Co.* case, *supra*, is correct and we adhere to that decision, i. e., that the commodity which is used as a fertilizer, of which this peat moss forms an ingredient, is not the result of a manufacturing process, and therefore we hold that the imported merchandise is not used chiefly as an ingredient in the manufacture of fertilizers.

Plaintiff's claims are therefore overruled and judgment will be rendered for the defendant.